**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William James WEINRICH, Michael Wiley Blair, Terry Wesley Gue, George Robert Henderson, Robert Carl D'Antonio, Jean Marc Senecal and Billy Guy Pilgrim, Defendants-Appellants.**

No. 78–5092.

United States Court of Appeals, Fifth Circuit.

Dec. 15, 1978.

Rehearings Denied Jan. 23, 1979.

William W. Corry, Tallahassee, Fla., Frank Alderman, III, Fort Myers, Fla., for Weinrich.

Alan Jay Braverman, Fort Lauderdale, Fla., for Blair.

Robert A. Douglass, St. Petersburg, Fla., for Gue.

Wilbur C. Smith, III, Fort Myers, Fla., for Henderson.

Guillermo A. Ruiz, St. Petersburg, Fla., for D'Antonio, Senecal, Pilgrim.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Judy S. Rice, Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before WISDOM, AINSWORTH and CLARK, Circuit Judges:

CHARLES CLARK, Circuit Judge:

This consolidated appeal results from convictions for conspiracy and multiple substantive counts involving importation and distribution of marijuana and hashish.[1] Caught red-handed, the defendants principally attack, not their guilt, but the manner of their apprehension and trial. They severally challenge the legality of various wiretaps and searches that led to their ar-

---

1. Specifically, defendants were variously charged as principals or aiders and abettors under 18 U.S.C. § 2, with violations of 21 U.S.C. §§ 841(a)(1), 952(a), 959(2), 960(a)(1), 960(a)(3), and 963.

rests, allege errors in the conduct of their trial, and attack the constitutionality of the federal marijuana laws. We find all of their contentions unmeritorious and affirm their convictions.

## I. FACTS

The defendants were apprehended in the early morning hours of June 22, 1977, from three vessels off the coast of Florida. Approximately 6,000 pounds of marijuana and smaller quantities of hashish were confiscated from the vessels. The apprehension of the defendants and seizure of the contraband were accomplished through the combined efforts of Florida State and local authorities, various federal agencies and the United States Coast Guard. The defendants attack virtually every aspect of the police activity leading up to and including the boarding and search of the vessels.

The investigation that ultimately culminated in the defendant's arrests began with a series of wiretaps conducted by the Florida Department of Criminal Law Enforcement ("FDCLE"). FDCLE Special Agent Charles Layman received a tip from a confidential source on November 10, 1976, that Neil Ryder, not a defendant in this case, was involved in the importation and distribution of narcotics. Further information concerning Ryder was obtained from a second confidential source on January 18, 1977. Relying on information from the two confidential sources and certain other information obtained through independent investigation, Agent Layman applied for a court order authorizing a wiretap on Ryder's phone. Authorization for the wiretap was granted on February 18, 1977 by Judge John A. Rudd of the Leon County, Florida Circuit Court.

As a result of the initial wiretap (the "Ryder Wiretap") information was obtained which led Agent Layman to apply for a second wiretap order on the phone of Chuck Mitchell. The second wiretap request was supported primarily with information obtained from the Ryder wiretap; it also was approved by Judge Rudd. Using information obtained from the first two wiretaps, Agent Layman next applied to the Florida Supreme Court for an order approving a wiretap at a motel in Tampa, Florida, and the Florida Supreme Court approved the request. The FDCLE investigation continued through what ultimately became a series of eight wiretaps. Each successive wiretap application in the sequence incorporated information from the wiretap that preceded it.

Several of the wiretaps, including the initial Ryder wiretap, resulted in the interception of conversations of William James Weinrich, one of the defendant-appellants. An April 13, 1977 conversation involving Weinrich made reference to "pot," "125,000 pounds of gold," "Bogota" and "offloading sites." Following the April 13 conversation, the FDCLE began physical surveillance of Weinrich; that surveillance led the agents to a house on the intercoastal waterway in Nokomis, Florida.

On June 13, 1977, the FDCLE received a report from Sergeant Grass, a deputy county sheriff from Pinellas County, Florida. Sergeant Grass stated that an informant had told him that a vessel loaded with marijuana was to arrive from South America within twenty days, and that the marijuana would be offloaded at a house on the intercoastal waterway matching the description of the house in Nokomis that was already under surveillance as a result of the FDCLE investigation of Weinrich. Four days later, on June 17, 1977, a 34 foot cabin cruiser, the "Big Daddy," was observed moored to the dock behind the house, and twenty-four hour surveillance by the FDCLE began.

The Big Daddy left its mooring on the intercoastal waterway in the late afternoon of June 21, 1977, and began to head for open sea; it was immediately placed under aerial surveillance. At about 6:30 p.m., the Big Daddy pulled alongside two other boats, a 31 foot Bertram called the "Cat's Paw," and a 60 foot converted shrimp trawler, the "Deux Dauphins."[2] The Big Daddy and

2. The name "Deux Dauphins" was the name under which the vessel was registered in Cana-

da. The American registry of the vessel was under the name "Jonathan." At the time the

Cat's Paw tied up to the larger Deux Dauphins for about one hour. The two smaller boats then broke off from the Deux Dauphins and began heading in tandem toward the Florida Coast, while the Deux Dauphins headed toward international Waters. Aerial surveillance of all three vessels continued, and police boats were dispatched and directed by surveilling aircraft to the location of the Big Daddy and Cat's Paw.

Surveillance of the Big Daddy and Cat's Paw continued undetected as the two boats approached the Florida Coast near Boca Grande, Florida. At about 1:30 a.m., as the two boats entered Boca Grande pass, subjects on the Big Daddy turned on a spotlight, with the apparent purpose of searching for a buoy. Instead, the spotlight illuminated one of the surveillance boats, a Florida Marine Patrol boat marked "Police." At that point the FDCLE agent in charge of surveillance ordered the Big Daddy and Cat's Paw boarded. Bales of marijuana totalling 6,000 pounds were found on the two boats, and a package of hashish was found on the Cat's Paw. A document pertaining to the Deux Dauphins was found on the Big Daddy. Defendants Weinrich, Blair and Busch were arrested on board the Cat's Paw; and defendants Gue, Henderson and Ray were arrested aboard the Big Daddy.

News of the marijuana confiscation was immediately radioed by a federal Customs Officer who had been working in concert with the FDCLE to the Coast Guard Cutter Point Thatcher. The Point Thatcher had been trailing the Deux Dauphins in the Gulf of Mexico with aerial assistance. Upon receiving the radio message, the Point Thatcher had the Deux Dauphins illuminated from the air. Subjects on board were observed rinsing the deck with water. The vessel was boarded, and customs officers noticed odors of lemon-scented disinfectant and marijuana. A carpet on the rear deck was rolled back and a substance that appeared to be marijuana residue was found. A field test was performed, and the substance was confirmed to be marijuana. Also found on board were the belongings and identification of Michael Busch, one of the men arrested on the Cat's Paw. Defendants Senecal, Pilgrim and D'Antonio were placed under arrest.

Meanwhile, back at the Boca Grande Pass, the six defendants from the Cat's Paw and Big Daddy were placed under the custody of FDCLE Agent Gilliland. Defendants Ray, Henderson and Blair all made statements to Agent Gilliland after they had been given *Miranda* warnings.

All of the appellants were jointly charged and convicted in a single jury trial of conspiracy to import marijuana and hashish. Senecal, Pilgrim and D'Antonio from the Deux Dauphins were convicted of distributing marijuana knowing it would be imported into the United States. Henderson and Gue from the Big Daddy were convicted of importing marijuana and possessing marijuana with intent to distribute. Weinrich and Blair from the Cat's Paw were convicted on counts of importing marijuana, importing hashish, possessing marijuana with intent to distribute and possessing hashish with intent to distribute.[3] Sentences were imposed ranging from probation to four year's confinement and these appeals ensued.

Defendants in separate attacks mount a many-pronged assault on their convictions.

vessel was stopped, the boat was apparently still under United States registry but was being changed to Canadian registry. The name was spelled "Deux Dauphing" on the stern of the boat and "Deux Dauphin" on the side. The paint from one of the letters on the stern appeared to have run, and the other letters appeared to be in rough printing. Counsel for the government consistently refer to the vessel by its American appellation, "Jonathan," while counsel for the defendants use the Canadian "Deux Dauphins." We intimate no view on the issue concerning which registry controlled at the time of the significant events of June 21 since we hold in part III(C) that the Coast Guard had authority under the circumstances to search the vessel whether it was of foreign or domestic registry.

3. The two other defendants below, Busch and Ray, are not parties to this appeal.

Alleging that the initial Ryder wiretap was illegal, they claim that all subsequently developed evidence should have been suppressed as fruit of the poisonous tree. The legality of the warrantless searches of all the vessels are challenged as lacking either probable cause or exigent circumstances sufficient to excuse the failure to obtain warrants, and the authority of the Coast Guard to stop the Deux Dauphins in international waters is attacked. Various of the defendants claim errors at trial, including alleged misjoinder of parties, *Bruton* violations, prosecutorial misconduct on summation, and insufficiency of evidence. Appellant Gue attacks the constitutionality of the Comprehensive Drug Control Act, 21 U.S.C. § 841(a)(1), as lacking a sufficient nexus to interstate commerce.

## II. THE LEGALITY OF THE RYDER WIRETAP

The appellants assert that the initial Ryder wiretap was authorized without probable cause because the application for the wiretap was based primarily on confidential source information that was both fatally stale and unreliable. If the Ryder wiretap was illegal, the appellants claim, all subsequently developed evidence, including all information obtained from the succeeding dependent wiretaps, would be tainted as fruit of the poisonous tree. The government defends the reliability and sufficiency of the information upon which the probable cause finding was made, claims that the information was not fatally stale, and challenges the standing of the appellants to even assert fourth amendment violations involving taps on Ryder's phone. We find that the information contained in the wire-

tap application was sufficiently detailed and corroborated to constitute probable cause and that the information was not fatally stale.[4]

### A. Probable Cause

■■■■ An order authorizing a wiretap, like an ordinary search warrant, must be supported by a magistrate's finding of probable cause. *United States v. Hyde*, 574 F.2d 856, 862 (5th Cir. 1978). The governing federal statute, 18 U.S.C. § 2518(1)(b), requires that a wiretap application contain a "full and complete statement of the facts and circumstances relied upon by the applicant to justify his belief that an order should be issued." Where much of the information contained in the supporting affidavit comes from confidential informants, the magistrate's determination of probable cause must be measured against the familiar standards of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). In evaluating the magistrate's judgment in light of the standards set forth in *Aguilar* and *Spinelli,* our review is limited. We have held that in assessing probable cause the magistrate must use his own judgment based on the entire picture presented to him and utilizing his common sense. *Bastida v. Henderson*, 487 F.2d 860 (5th Cir. 1973). "[W]hen this is done his determination is conclusive in the absence of arbitrariness." *Id.* at 863; *United States v. Hyde, supra,* 574 F.2d at 862.

■■■■ Agent Layman's supporting affidavit for the Ryder wiretap was based primarily on information from two separate confidential sources, bolstered by informa-

---

**4.** *United States v. Scasino,* 513 F.2d 47 (5th Cir. 1975), interpreted 18 U.S.C. § 2510(11), which provides that an "aggrieved person" may move to suppress the contents of an unlawfully intercepted communication. There, we held that only "one who participated in the intercepted conversation or on whose premises the conversation occurred" had standing to challenge the fruits of an illegal wiretap. 513 F.2d at 50. Our holding was based on the Supreme Court's ruling in *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1968), that

the wiretap statute incorporated existing fourth amendment standing principles. Only the appellant Weinrich had any conversations intercepted by the Ryder wiretap. Despite the implications of *Scasino,* the other appellants contend that if the evidence was inadmissible as to their co-defendant Weinrich, they can challenge its admission in their joint trial. Since we determine that the Ryder tap was not illegal, we do not reach any question related to standing. *See United States v. Hyde,* 574 F.2d 856, 862 n.2 (5th Cir. 1978).

tion obtained through independent investigation. The affidavit stated that on November 10, 1976, and at several succeeding meetings, Agent Layman's first confidential source supplied him with detailed information concerning the activities of Neil Ryder. The source identified Ryder as a large scale marijuana and cocaine dealer in the Tallahassee, Florida area, and provided specific directions to Ryder's house, Ryder's telephone number, and descriptions of two vehicles driven by Ryder. The source related in detail the operations conducted by Ryder, explaining that Ryder obtained Colombian marijuana from Tom Strang of Fort Lauderdale, Florida by travelling to Fort Lauderdale once or twice weekly to purchase the marijuana in 75 to 100 pound quantities. The marijuana was then assertedly transported to the residence of Chuck Mitchell, whose physical description, address and phone number were provided. The informant also related that at Mitchell's house the marijuana was broken up into smaller lots of 5 to 30 pounds for distribution. Ryder and Mitchell were close associates who usually purchased marijuana jointly and then split it for separate distribution. Ryder also purchased cocaine from David Polanski of Sacramento, California, who was described as a drug counselor who was living with Ryder's sister in California. Polanski's phone number was provided, and it was asserted that Ryder usually flew to California to obtain 89 to 93 per cent pure cocaine in one half to one pound quantities. The source stated that the cocaine was stored by Ryder in safety deposit boxes at the Ellis National Bank. Detailed background information was given concerning Ryder's marijuana supplier, Strang, including date of birth, physical description, address, phone number, a description of Strang's automobile, and the nick-names of two persons who live with Strang and work as his partners, "Red" and "Will." Strang was said to keep large amounts of cash at his residence for use in his drug dealings. Strang's source of supply was described as a person named "Steve," whose physical description was provided. Steve was stated to have access to several boats which were used to smuggle marijuana from Colombia. A series of persons were named who purchase marijuana and cocaine from Ryder, and several of their addresses and phone numbers were provided. Among the purchasers listed was one Jerry Jennings. Finally, the source described a telephone code based on letters of the alphabet that was used to designate the day, time and airline flight number on which a drug shipment was to be made from California. A copy of the code was provided.

Some of the information from the first informant was corroborated by a separate confidential source on January 18, 1977. The second source stated that he had been associated with Ryder and Strang and had himself purchased marijuana from Strang in amounts up to one hundred pounds. The second source confirmed that Chuck Mitchell was an associate of Ryder, that Strang was Ryder's supplier, that Ryder was a middle-level distributor who purchased marijuana from Strang in amounts up to 100 pounds, that Strang's source of supply was "Steve," that Strang worked with Red Strang and Will Raabe, that large amounts of currency were kept at Strang's house, and that Ryder and his associates transacted much of their business by phone. The second source stated that he frequently stayed at the Strang residence and had on one occasion observed Ryder purchasing marijuana from Strang.

Agent Layman was able to corroborate some of the details of the information obtained from his two informants by independent investigation. Addresses, phone numbers, and vehicle descriptions were independently confirmed. Investigation at the Ellis National Bank verified that Ryder and Mitchell were co-renters of a safety deposit box, and Mitchell's pick-up truck was observed on several occasions at Ryder's house. Jerry Jennings, who was claimed by the first source to be one of Ryder's customers, was arrested for possession of 25 pounds of marijuana. Ryder's name and telephone number were found in Jennings' address book and the affidavit stated that Ryder posted a cash bond for

Jennings' release.[5] Agent Layman subpoenaed telephone company records that revealed frequent calls to a half-way house for drug offenders in California and to the California residence of his sister, who assertedly lived with Ryder's alleged cocaine supplier, Polanski. Calls were also listed to the numbers of Chuck Mitchell, to Strang and his associates in Fort Lauderdale, and to the numbers of various purchasers named by the first source, including Jerry Jennings. Agent Layman's affidavit stated that a wiretap was necessary because normal investigatory techniques such as the use of informants, undercover officers, physical surveillances and search warrants would result in premature disclosure of the investigation of what appeared to be an organized ring of narcotics smugglers and distributors.

We find that the information contained in Agent Layman's application was more than adequate to meet the *Aguilar-Spinelli* standards. *Aguilar* required that the affidavit disclose "some of the underlying circumstances from which the informant concluded that his information was accurate," and also "some of the underlying circumstances from which the officer concluded that the informant . . . was 'credible' or his information 'reliable.'" 378 U.S. at 114–115, 84 S.Ct. at 1514. *Spinelli* elaborated on *Aguilar* by stating that even when the literal requirements of *Aguilar* are not met, probable cause may exist if it can "fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, it as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration." 393 U.S. at 415, 89 S.Ct. at 588. We summarized three ways in which the *Aguilar-Spinelli* standard could be satisfied in *United States v. Squella-Avendano,* 447 F.2d 575, 580 (5th Cir. 1971):

First, if the information provided is in such "detail" and "minute particularity" that "a magistrate, when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way," then the report, if sufficiently incriminating, may, without more, be grounds for finding probable cause. Secondly, less detailed information from a reliable source may be used as grounds for a finding of probable cause if independent investigation by law enforcement agencies yields sufficient verification or corroboration of the informant's report to make it "apparent that the informant had not been fabricating his report out of whole cloth." Corroboration must render the report "of the sort which in common experience may be recognized as having been obtained in a reliable way." Thirdly, even a report that is not under the above two standards sufficient of itself to establish probable cause may count in the magistrate's determination of probable cause, but only as one of a number of other factors of "further support" tending to show probable cause. Examples of satisfactory "further support" given in *Spinelli* involved law enforcement agencies' knowledge of independent facts which suggest criminal conduct or of facts which take on an aura of suspicion in light of the informant's tip.

Both confidential sources relied on by Agent Layman easily meet the first requirement of *Aguilar* that the underlying circumstances from which the sources drew their conclusions be disclosed. The second source explicitly stated that he was an associate of Ryder and Strang, that he had lived at Strang's house and observed Strang's operations, that he had purchased marijuana from Strang in quantities up to 100 pounds, and that he had personally observed Ryder buying marijuana from Strang. These averments are sufficient in and of themselves to satisfy the first prong of *Aguilar. United States v. Garner,* 581 F.2d 481, 484 (5th Cir. 1978); *United States v. Mendoza,* 433 F.2d 891, 894 (5th Cir. 1970). Although the first confidential source does not disclose his relationship to Ryder or how he obtained his information, the sheer vol-

but obtained the bail for Jennings through a bondsman.

ume of information furnished and the minute detail in which it was provided were sufficient to allow the magistrate to reasonably infer that the information had been gained in a reliable way. In *Hyde* we held under similar circumstances that the first prong of *Aguilar* was satisfied when a "drug smuggling conspiracy of wide scope and long standing is described in some detail, and it is alleged that the telephone sought to be tapped was used in furtherance of the conspiracy." 574 F.2d at 862.

We are equally persuaded that the affidavit satisfies *Aguilar's* second requirement that facts and circumstances be set forth which indicate that the informants should be considered reliable. The defendants focus on the lack of any assertion by Agent Layman that his sources are reliable. No averment by the police-officer explicitly endorsing the informants' reliability is required, however. *United States v. Harris,* 403 U.S. 573, 581–82, 91 S.Ct. 2075, 2081, 29 L.Ed.2d 723 (1971). The appellants also closely scrutinize each discrete bit of information contained in the affidavit and attack its credibility or offer an innocent explanation for its existence. This court sitting *en banc* recently noted, however, that "We must also be mindful that probable cause is the sum total of layers of information and the synthesis of what police have heard, what they know, and what they observed as trained officers. We weigh not individual layers but the 'laminated' total." *United States v. Edwards,* 577 F.2d 883, 895 (5th Cir. 1978) (en banc) *quoting Smith v. United States,* 123 U.S.App.D.C. 202, 206, 358 F.2d 833, 837 (1966), *cert. denied,* 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967).

Viewing the information as a "laminated total," Agent Layman's affidavit contains several recognized indicia of reliability. All of the crucial incriminatory facts contained in the affidavit were cross-verified by the two independent confidential sources. We held in *Hyde* that mutually enforcing and corroborative information from confidential sources is a strong indicator of probable cause even when the individual reliability of the sources is not clearly established. 574 F.2d at 863. *See also United States v. Harris,* 403 U.S. 573, 580–81, 91 S.Ct. 2075, 2080; *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960). Both confidential sources told their stories in "minute particularity," a factor held sufficient to satisfy the *Aguilar-Spinelli* standard in *Squella-Avendano,* 447 F.2d at 580. To the fullest extent possible, details of the informants' stories were verified by independent investigation. Confirmation of the accuracy of physical descriptions of the various dramatis personae, addresses, phone numbers, and automobiles all tend to make it highly probable that "the informant had not been fabricating his report out of whole cloth." *Spinelli, supra,* 393 U.S. at 417, 89 S.Ct. at 590. *See also Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1958).

Phone records indicated that Ryder had frequent contact with people named by the informants as Ryder's associates, suppliers and buyers. Investigation at the Ellis National Bank indicated that Ryder and Mitchell shared a safety deposit box. Ryder's name and phone number were found in Jennings' apartment after Jennings was arrested for possession of marijuana and Ryder arranged for Jennings' $7,000 bail. The defendant's protest that none of the independent corroboration by police was itself incriminating. The purpose served by the independent police work, however, was not to itself establish the probability of criminal activity, but merely to provide a basis for believing that those informants were reliable. That much it obviously did. All that is required to satisfy *Aguilar* is a substantial basis for believing the informant's story is credible. *United States v. Harris,* 403 U.S. 573, 581, 91 S.Ct. 2075, 2081. *See Jones v. United States, supra,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697. Finally, the second informant's information included an admission that he himself had participated in criminal activity with the subjects of the investigation, a factor recognized in *Harris* as providing a basis for crediting an informant's information. 403 U.S. at 583, 91 S.Ct. at 2082.

In sum, the various aspects of Agent Layman's affidavit were sufficient to establish reliability both individually and in the sum of their parts. The detail of the informant's stories, their cross-corroboration, the partial independent verification by police, and the admission against penal interest by the second source all work to provide probable cause.

### B. Staleness

The appellants assert that the information relied on in the wiretap application was fatally stale. They state that the first informant's tip was given on November 10, 1976, one hundred days prior to the application, and the second tip came on January 18, 1977, thirty days prior to the application. The government points out that the affidavit states that Agent Layman met with his first source on November 10, "and on several succeeding meetings," and that the second informant met with Agent Layman on January 18 "and on other occasions."

The function of a staleness test in the search warrant context is not to create an arbitrary time limitation within which discovered facts must be presented to a magistrate. Rather, the assay focuses on one relevant part of the determination that reasonable probable cause exists to warrant the issuance of an order to perform a wiretap or make a search. Out-of-date information as to a single transaction could be seen to describe no more than an isolated event in the past. Such an affidavit would not create probable cause to believe that similar or other improper conduct is continuing to occur. On the other hand, information which demonstrates a chain of related events covering a broad span of time continuing to the current period may furnish a most reliable indicia of present activity, thereby clearly demonstrating that probable cause exists for the order to intrude.

The basic rule in this circuit for determining staleness was set forth in *Bastida v. Henderson*, 487 F.2d 860, 864 (5th Cir. 1973):

> In general, the basic criterion as to the duration of probable cause is the inherent nature of the crime. The Circuits hold that where an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance.

In *Hyde* we interpreted the *Bastida* rule in the specific context of a wiretap application used in an investigation of ongoing narcotics activity:

> The upshot of this rule in practical application has been to allow fairly long periods of time to elapse between information and search warrant in cases where the evidence clearly shows a long-standing, ongoing pattern of criminal activity. This result is even more defensible in wiretap cases than in ordinary search warrant cases, since no tangible objects which can be quickly carried off are sought.

574 F.2d at 865. *Hyde* held that information between 46 and 30 days old was not fatally stale when the evidence before the magistrate indicated an ongoing drug operation involving extensive telephonic communication that had been in existence for at least two years:

> [S]taleness is an issue which must be decided on the peculiar facts of each case, and . . . a mechanical count of days is of little assistance in this determination. Here, the affidavit alleged a conspiracy that had continued for at least 2 years. It included information considerably less than 2 months old as well as the most recent telephone records available. It was permissible for the justice to infer that if criminal conversations had been occurring over this telephone line over the past 2 years, they had not mysteriously stopped within the past month. We cannot disturb on staleness grounds his finding of probable cause.

*Id.* The facts in the case before us are indistinguishable from *Hyde*. Information such as the second informant's tip was as recent as 30 days before the application,

while other information such as the first use of the safety deposit box at the Ellis National Bank dated back two years prior to the application. The stories told by both informants and the phone records showing activity from Ryder's phone all tended to indicate the presence of an extensive ongoing criminal enterprise. It certainly was not unreasonable for the judge to conclude that the activity was continuing as of the date of the application.

### III. THE LEGALITY OF THE SEARCHES

#### A. Probable Cause

The government lists three factors which it asserts led investigating agents to a conclusion that they had probable cause to board and search the Cat's Paw and Big Daddy on the night of June 21: (1) the intercepted conversations of Weinrich that made reference to "pot," "125,000 pounds of gold," "Bogota" and "offloading sites"; (2) information from an independent source that a shipment of Colombian marijuana was going to be offloaded at a house on the intercoastal waterway matching in description the house in Nokomis previously traced to Weinrich; and (3) the one hour at-sea rendezvous between the Cat's Paw, Big Daddy and Deux Dauphins.

The appellants vigorously assert that none of the three factors relied on by the government is sufficient to establish probable cause. Those factors are not to be assessed as individual component parts, however, but in terms of the cumulative "laminated total" of circumstances as they appear to trained law enforcement officers. *United States v. Edwards, supra,* 577 F.2d at 895. The test is whether a man of reasonable caution would believe an offense is being committed. *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). A clandestine offshore rendezvous involving a vessel linked to a person suspected of drug trafficking because of intercepted phone conversations at a spot corresponding to an informant's description of the place where a large marijuana shipment is expected would lead a man of ordinary caution to believe that smuggling was taking place. Ample probable cause existed to stop the Cat's Paw and Big Daddy.

#### B. Exigent Circumstances

Probable cause to believe that the Cat's Paw and Big Daddy were involved in the smuggling of marijuana came into existence sometime around 6:30 p. m. on the evening of June 21, when the two boats staged their rendezvous with the Deux Dauphins. However, the boarding and searches of the vessels did not take place until about 1:30 a. m., seven hours later. In that interim period the Cat's Paw and Big Daddy were under surveillance by aircraft and police motor boats, but during that time law enforcement officials did not attempt to procure a search warrant from a magistrate on the shore. The appellants claim that the failure to obtain a warrant during the seven hour surveillance period rendered the search of the vessels illegal. We do not agree.

The warrantless search of the Cat's Paw and Big Daddy was justified by what is usually termed the "automobile exception" to warrant requirement, *see Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971). A fortiori this exception applies to sea-going vessels at night when all of the vagaries of vehicular travel on land are compounded by random courses and devious actions permitted by open water and darkness. The automobile exception had its genesis in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), in which Chief Justice Taft stated:

> On reason and authority the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid.

267 U.S. at 149, 45 S.Ct. at 283. The Supreme Court has several times reaffirmed the validity of warrantless automobile

searches on the basis of an automobile's mobility and the special dangers it presents for the destruction of evidence. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).

The agent in charge of the surveillance of the Cat's Paw and Big Daddy made the decision to seize the two vessels when a spotlight from the Big Daddy revealed to the suspects on board that they were being trailed by police boats. That instantaneous law enforcement judgment was certainly reasonable in light of the circumstances; an immediate boarding was mandated by concern for the safety of police personnel, and the possibility that evidence would be thrown overboard. Although it appears unlikely that escape by the two suspect boats would have been ultimately successful, it was not at all impossible that evasive tactics might have stolen the time needed to destroy evidence, or possibly necessitated the use of force to accomplish the boarding. *See United States v. Cadena,* 585 F.2d 1252, 1263 (5th Cir. 1978). The agent in charge had no way of knowing whether the suspects on board were armed or how they would react to a boarding attempt. An immediate boarding effort for the purpose of pre-empting all possible difficulties was reasonable action well within the authority of the *Carroll-Chambers* line of cases.[6]

▇▇▇▇▇ The otherwise valid warrantless search was not rendered invalid because the police chose to surreptitiously follow the boats for several hours rather than converge on the craft immediately after their rendezvous. "[P]olice officers are not required to search or arrest at the exact moment probable cause arises." *United States v. Clark,* 559 F.2d 420, 425 (5th Cir. 1977). "Good police practice often requires post-

poning an arrest, even after probable cause has been established, in order to place the suspect under surveillance or otherwise develop further evidence necessary to prove guilt to a jury." *United States v. Watson,* 423 U.S. 411, 431, 96 S.Ct. 820, 831, 46 L.Ed.2d 598 (1976) (Powell, J., concurring). As the Supreme Court stated in *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality opinion):

> Respondent contends that here, unlike Chambers, probable cause to search the car existed for some time prior to arrest and that, therefore, there were no exigent circumstances. Assuming that probable cause previously existed, we know of no case or principle that suggests that the right to search on probable cause and the reasonableness of seizing a car under exigent circumstances are foreclosed if a warrant was not obtained at the first practical moment. Exigent circumstances with regard to vehicles are not limited to situations where probable cause is unforeseeable and arises only at the time of the arrest. The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action.

*See also United States v. Lovasco,* 431 U.S. 783, 791, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977). Under *Cardwell,* the fact that the police might have obtained a warrant at some earlier point during their surveillance of the Cat's Paw and Big Daddy does not negate the reasonableness of prompt warrantless seizure of the vessels once police surveillance was uncovered. The police were in the midst of a surveillance at night on open water in which the necessity for an immediate boarding of the vessels might

---

**6.** It has been suggested that pursuant to the language used by the Supreme Court in *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the diminished expectation of privacy which surrounds an automobile makes warrantless searches "the general rule" in the automobile context, whether or not exigent circumstances in the classic sense of ease of mobility or destruction of evidence exist.

See *United States v. Gaultney,* 581 F.2d 1137, 1148 (5th Cir. 1978) (Gee, J., concurring). Because exigent circumstances of the conventional type clearly did exist in the searches in this case, we need not decide whether a diminished expectation of privacy in the sea-going vessels would also have justified the warrantless searches.

occur at any second. It was completely reasonable for the government to choose to shadow the vessels to the shore and then to seek out a magistrate rather than to interrupt surveillance by any part of their forces in the midst of developing events. See *United States v. Cadena, supra,* at 1263. That the police were well organized and apparently had the situation enough in hand that they could afford the luxury of allowing the scheme to more fully develop is only to their credit, it cannot affect the presence of exigent circumstances. As this court en banc stated in the context of automobile searches:

> We have never before tested mobility of automobiles or exigence of circumstances by evaluating police capability to respond or the balance of forces deployed. Once commenced, the end of such a calculus would be evaluation of the opposing armaments and of the relative top speeds of the vehicles. We decline to embark on it.

*United States v. Mitchell,* 538 F.2d 1230, 1233 (5th Cir. 1976) (en banc). The searches here are well within the conventional formulation of the *Carroll-Chambers* exception to the warrant requirement, and *Cardwell* makes it plain that delay between the time when probable cause first commences and arrest occurs does not vitiate that exception. The warrantless searches of the Cat's Paw and Big Daddy were clearly valid.[7]

### C. The Authority of the Coast Guard to Search the Deux Dauphins

■ The Coast Guard boarded the Deux Dauphins in international waters in the Gulf of Mexico. Appellants Senecal, Pilgrim, and D'Antonio, the three defendants apprehended on the Deux Dauphins, challenge the Coast Guard's authority to have conducted the search.

The Deux Dauphins was boarded by personnel from the Coast Guard Cutter Point

Thatcher soon after the Point Thatcher was informed by radio that the Cat's Paw and Big Daddy had been found with marijuana. Probable cause to believe that the Deux Dauphins had been engaged in smuggling thus existed, and exigent circumstances of the same sort that justified the search of the smaller craft plus the danger of flight justified the warrantless search of the Deux Dauphins. The appellants nonetheless argue that the Deux Dauphins was a foreign vessel in international waters at the time of the Coast Guard search, and that the Coast Guard has no authority to make extraterritorial searches of foreign vessels. This court's recent opinion in *United States v. Cadena,* 585 F.2d 1252 (5th Cir. 1978), however, squarely holds that the Coast Guard does have authority to conduct searches of foreign vessels in international waters when there is probable cause to believe that the vessel is being used to import marijuana into the United States. *Cadena* is controlling here.

## IV. THE CONDUCT OF THE TRIAL

### A. Misjoinder

■ Appellant Blair complains of prejudicial misjoinder on the grounds that the counts on which he was tried were improperly joined with counts two and five in the indictment, counts on which Blair was not charged. Blair, along with all other defendants, was charged with one count of conspiracy. Blair was also charged with four substantive counts: importing marijuana, importing hashish, possessing marijuana with intent to distribute, and possessing hashish with intent to distribute. Blair attributes prejudice to the fact that those counts were joined with the two counts that were brought only against defendants from the Deux Dauphins, distributing marijuana

---

7. This court in *Cadena* stated under similar factual circumstances:

> We need not consider whether a warrantless search would otherwise have been constitutionally infirm; considering the mobility of vessels, it suffices that, as the facts unfolded, the government's conduct was justified by the circumstances present when it oc-

curred. Until the search and seizure were made, the failure to obtain the warrant was but an inchoate error without effect on individual rights; at the time of the search and seizure, there was justification for proceeding without a warrant.

At 1263.

and distributing hashish knowing they would be imported into the United States.

Rule 8(b) of the Federal Rules of Criminal Procedure, however, explicitly endorses the type of joinder involved in this case:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Contrary to Blair's assertions, there is a substantial identity of facts as to all of the substantive counts that were charged against all defendants, and all counts arose from "the same series of acts or transactions" as required by the Rule. It is settled law that an indictment that charges multiple defendants with participation in a single conspiracy and also charges one or more but not all of the defendants with various substantive counts arising from the same conspiracy is proper and involves no misjoinder. *United States v. Register*, 496 F.2d 1072, 1084 (5th Cir.) *cert. denied sub nom. Cochran v. United States*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 819 (1975). Combining the trial of all defendants from all three vessels thus did not constitute improper joinder. *See United States v. Fogelman*, 586 F.2d 337, 342 (5th Cir. 1978).

*B. Agent Gilliland's Testimony*

■ Appellant Blair contends that testimony by Agent Gilliland concerning statements made to him by the defendant Ray should not have been admitted because it was hearsay not within the coconspirator's exception to the hearsay rule and because it violated Blair's sixth amendment right to confrontation under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Agent Gilliland testified that after the six defendants from the Cat's Paw and Big Daddy had been placed in his custody on the shore, one of the defendants, Ray, made a statement to him to try to explain his presence on the boat.

Over the objections of defendants' counsel, the trial court permitted Gilliland to testify but required that all references allegedly made by Ray to other co-defendants be excised and replaced with the word "someone." Agent Gilliland then testified that "Mr. Ray stated that he was asked by someone to proceed to Clearwater, Florida, and make repairs on a boat." The trial court immediately gave a limiting instruction to the jury indicating that Gilliland's testimony as to Ray's statement was admissible only against Ray. Later in the trial, Ray took the witness stand and testified. On direct examination by Ray's counsel Ray himself explained what he had said to Agent Gilliland. On cross-examination by the prosecutor, Ray was asked, "Who requested that you come to Clearwater in June?" Ray replied that "A gentleman that rents a tractor off of me, Michael Rissick, said that Mr. Blair had a new boat and wanted to know if I would go out on it the first time to check the engine out." Ray also testified that he had known Blair for about six years but was "not that close" to him. Blair's counsel was given an opportunity to cross-examine Ray but did not do so.

None of Blair's rights under either *Bruton* or the Federal Rules of Evidence were violated by the procedure followed by the district court. No *Bruton* violation occurred because Blair and all the other defendants were given the right to confront Ray on cross-examination when Ray actually testified. As the Supreme Court held in *Nelson v. O'Neil*, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971):

It was clear in *Bruton* that the "confrontation" guaranteed by the Sixth and Fourteenth Amendments is confrontation *at trial*—that is, that the absence of the defendant at the time the codefendant allegedly made the out-of-court statement is immaterial, so long as the declarant can be cross-examined on the witness stand at trial.

402 U.S. at 626, 91 S.Ct. at 1726 (emphasis in original). *See also California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26

L.Ed.2d 489 (1970). Blair's concern that the jury would infer that the "someone" in Ray's statement referred to Blair cannot be the predicate for a *Bruton* violation when it was open to Blair to directly confront Ray on cross-examination.

In the absence of any violation of Blair's right to confrontation under *Bruton*, all objections to Agent Gilliland's testimony under the Federal Rules of Evidence must also fail. Rule 801(d)(2)(A) states that a statement is not hearsay if it is offered against a party and is "his own statement, in either his individual or representative capacity." Here, the district court warned the jury that Ray's statement was admissible only against Ray, and it took the precaution of excising all references to other defendants. No violation of Rule 801 occurred because the statement was only admitted against Ray. More significantly, no violation of any right to confrontation occurred because Blair and all other defendants were given the opportunity during the trial to cross-examine Ray in open court.

### C. Prosecutorial Misconduct on Summation

■ During her closing statement to the jury, the government prosecutor made the following statements with regard to the testimony of Agent Gilliland:

Now Mr. Gilliland took the stand and he told you what Mr. Ray said. And then he had a lot of defense questions. "I don't recall if I said that; I don't recall that." Some things he was specific about. "Have you ever promised anybody it would go easy on them?" "No, sir, I can't do that because I'm only a police officer."

He was positive about that. He had six people in his custody, his sole custody from 1:30 til they were finally picked up by police around 4:30 in the morning.

That's a lot of responsibility, one man, guarding six. He didn't just line them up against a wall and say, "Don't move." He took the handcuffs off and let them stretch and got them clothes because the mosquitoes were bad. He let them take restroom breaks. It is an awful lot of responsibility and he doesn't recall a lot of things.

But why would he recall that Mr. Ray said, "I took the job because I needed the money. They asked me if I wanted to unload and I said yes."

Because that was significant to a trained police officer. That is significant and it's significant to assume by the fact that on June 23rd when he wrote his report, that went in it; not all the small talk about "how's your mother; what are your children's names."

He's trained to remember what's specific, to note what is significant. He was an honest witness. He would not get up there and tell you no; that did not happen. Yes; that happened.

Immediately following the prosecutor's statements to the effect that Gilliland was "an honest witness," defense counsel objected and moved for a mistrial, on the grounds that the prosecutor was vouching for the credibility of a government witness. The court overruled the objection but did immediately instruct the jury that they were to judge the credibility and believability of witnesses for themselves and that they were to disregard the prosecutor's or any other attorney's personal opinions about such matters. In overruling the objection, the trial court admonished the prosecutor, out of the hearing of the jury, that "you shouldn't have said he's an honest witness. I think what you mean, he is doing the best he could."

Although we do not approve of the statement made by the prosecutor concerning the honesty of the witness, we agree with the trial court that, in the context of all the prosecutor said, the statement was basically an explanation of why Agent Gilliland was able to recall some details concerning the arrest and not others. Assuming arguendo it was error at all, it was harmless and promptly and properly corrected by the trial court.

This court has on many prior occasions reversed convictions when prosecutors have asserted their own credibility as a basis for

conviction, *e. g., United States v. Herrera,* 531 F.2d 788 (5th Cir. 1976); *United States v. Lamerson,* 457 F.2d 371 (5th Cir. 1972), or vouched for the credibility of a government witness by stating their own belief that the witness was telling the truth or that the hard work of the police had been "successful." *E. g., United States v. Brown,* 451 F.2d 1231 (5th Cir. 1971); *United States v. Serrano,* 496 F.2d 81 (5th Cir. 1974); *United States v. Corona,* 551 F.2d 1386 (5th Cir. 1977). One of the main concerns behind the rule against prosecutors vouching for the credibility of a witness is the danger that the jury will be led to believe that the prosecutor has other evidence, not presented to the jury, which indicates the defendant's guilt. *United States v. Prince,* 515 F.2d 564, 566 (5th Cir. 1975); *McMillian v. United States,* 363 F.2d 165, 168 (5th Cir. 1966); *Dunn v. United States,* 307 F.2d 883, 885 (5th Cir. 1962). Another danger is that the jury will be motivated to convict in vindication of the efforts expended by police or the judgment of the prosecution. In *Brown,* for example, we condemned statements by the prosecutor that "I personally feel [the agent] did a real good job . . . was doing his duty to his country . . . and was successful, in my opinion." 451 F.2d at 1231. Very similar statements brought reversal in *Serrano.* 496 F.2d at 82. In *Corona,* the prosecutor stated that agents "did the best they could under the circumstances . . . they're doing a dirty, nasty job and they're associating with dirty, nasty people, because I, for one, consider dope dealers and dope traffickers as dirty, nasty people." 551 F.2d at 1386. We have similarly condemned suggestions by prosecutors that the government tries to prosecute only the guilty. *E. g., United States v. Lamerson,* 457 F.2d at 371, 372 (5th Cir. 1972); *Hall v. United States,* 419 F.2d 582, 587 (5th Cir. 1969).

The statement made by the prosecutor in this case that Agent Gilliland was an honest witness is not at all the type of statement that has previously been regarded as automatic reversible error by this court. The prosecutor was not expressing any belief as to the guilt of the defendants, and was not applauding the law enforcement activities of Agent Gilliland, and was not suggesting the existence of other evidence of guilt not presented to the jury. When read in context, the statement was the conclusion to an explanation of why Agent Gilliland recalled certain details about the defendants but not others—the proffered answer being that certain details were more significant to a trained officer. Although the prosecutor went too far in including the statement that Agent Gilliland was honest, the mistake certainly did not warrant a mistrial. In *United States v. Prince,* 515 F.2d 564, 566 (5th Cir. 1975), we held that error by a prosecutor in stating that a witness "is going to tell you the truth . . . is going to tell you how it all happened" was cured by an immediate cautionary instruction. Reiterating our warning in *Prince* that expressions by the government concerning the honesty of its witnesses are "dangerous business," we follow *Prince* here and hold that the cautionary instruction, in light of the context of the prosecutor's remark, was sufficient to avoid reversible error.

Appellant Blair also complains that the prosecutor misstated testimony by stating that when she asked Ray who had asked him to come to Clearwater, Ray said "Blair," when in fact Ray testified that it was Rissick who told him that "Blair had a new boat and wanted to know if I would go out on it the first time to check the engines out." The essential import of the prosecutor's statement, that Ray traveled to Clearwater at Blair's behest, was a permissible interpretation of Ray's testimony concerning what Rissick had said about Blair and Ray's knowledge that the boat was owned by Blair. The deviation from Ray's actual testimony was minor and was offset by the court's instruction to the jury that it was to judge what the testimony was.

*D. Sufficiency of the Evidence*

The defendants were all apprehended on board vessels found to be carrying either marijuana, hashish, or marijuana residue. The vessels had just completed a rendezvous at night. On the larger Deux Dauphins the belongings and papers of one of the defendants on the Cat's Paw were found. On board the Big Daddy was

found a document pertaining to the Deux Dauphins. Numerous other facts were in evidence pertaining to the renting of the house in Nokomis, and the procurement of the vessels and equipment. Viewing the evidence in the light most favorable to the government, *United States v. Carlton*, 475 F.2d 104 (5th Cir. 1973), there was ample substantial evidence upon which a reasonably minded jury might exclude every hypothesis explaining the evidence other than guilt.

### V. CONSTITUTIONALITY OF THE DRUG CONTROL ACT

Appellant Gue asserts that § 841(a)(1) of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 841(a)(1), is unconstitutional because it does not require specific proof of a nexus with interstate commerce as a prerequisite for conviction. We extensively analyzed and rejected the same constitutional attack on § 841(a)(1) in *United States v. Lopez*, 459 F.2d 949 (5th Cir. 1972). *See also United States v. Lopez*, 461 F.2d 499 (5th Cir. 1972); *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed. 686 (1971). The law of this circuit is that the statute is constitutional.

The convictions are

AFFIRMED.