**UNITED STATES of America, Appellee,**

v.

**James E. HOWARD, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Berry L. PALMER, Appellant.**

Nos. 78–5047, 78–5048.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 6, 1978.

Decided Jan. 16, 1979.

Certiorari Denied March 26, 1979. See 99 S.Ct. 1547.

Leslie L. Gladstone, Baltimore, Md., for appellants.

Aaron Kadish, Baltimore, Md., on brief, for appellant Berry Lee Palmer.

Robert P. Trout, Asst. U. S. Atty., Baltimore, Md. (Russell T. Baker, Jr., U. S. Atty. and Gale E. Rasin, Asst. U. S. Atty., Baltimore, Md., on brief), for appellee.

Before BRYAN, Senior Circuit Judge, and WIDENER and HALL, Circuit Judges.

K. K. HALL, Circuit Judge:

Appellants Berry Lee Palmer and James Howard were both charged in the first count of a two-count indictment with conspiracy to distribute heroin in violation of 21 U.S.C. § 846; the second count charged Howard alone with engaging in a "continuing criminal enterprise" in violation of 21 U.S.C. § 848. A jury trial resulted in guilty verdicts against both on all charges.[1] Finding no reversible error in the conduct of the trial, we affirm.

The government's proof at trial showed that between 1975 and 1977 James Howard ran a drug distribution network in York and Harrisburg, Pennsylvania, using his minor children and a number of prostitute-addicts and dealers to sell heroin that he bought in Baltimore, Maryland. Berry Lee Palmer was one of the dealers. Much of the testimony at trial came from persons who had pleaded guilty and agreed to co-operate, from unindicted co-conspirators, and from addict-witnesses who had purchased heroin from Howard or Palmer. Several witnesses described in detail their activities as dealers for Howard, and also gave testimony regarding Palmer's activities as a dealer. Other witnesses testified that they had purchased heroin directly from Howard, either for cash or, in some instances, in return for sexual favors. Finally, a number of witnesses testified that they had purchased heroin "on the street" from Palmer.

*First.* Howard argues that the second count of the indictment should have been dismissed for non-specificity. The second count charged that the acts alleged in the first count were undertaken "in concert with at least five other persons with respect to whom the defendant JAMES E. HOWARD, a/k/a Crusher, occupied a position of organizer, a supervisory position, and any other position of management, . . ." These other persons were not named in this count, and we agree that under the circumstances of this case, the indictment alone does not "tell the defendant all that he needs to know for his defense . . . ." *United States v. Missler,* 414 F.2d 1293, 1297 (4th Cir. 1969) (citations omitted). However, this is not the end of the inquiry. In ruling that the indictment was sufficient, the trial judge relied on the case of *United States v. Sperling,* 506 F.2d

1. Four persons also charged in the first count of the indictment pleaded guilty before or during the course of the trial. Two other persons charged in the indictment were tried as co-defendants with Palmer and Howard; the trial resulted in a hung jury as to them.

1323 (2d Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). There it was said:

> In like vein, Sperling's claim that the indictment was legally deficient is little short of fatuous. He asserts that Count Two [charging continuing criminal enterprise in violation of 21 U.S.C. § 848] was defective because it failed to specify the names of the persons with whom he acted in concert and as to whom he occupied a position of organizer, and because it failed to specify each violation constituting the continuing series of violations proscribed by the statute. These contentions are wholly devoid of merit. Count Two tracts the statutory language. It contains every element of the offense charged. . . . *Moreover, Sperling was provided with a bill of particulars* which identified eight persons as to whom he occupied a position of organizer, supervisor or manager. . . .
>
> *The indictment as amplified by the bill of particulars* made it crystal clear to Sperling that this was the nature of the government's case and *afforded him an opportunity fairly and adequately to prepare his defense.* . . .

506 F.2d at 1344–45 (emphasis added).

Here, as in *Sperling,* the government furnished a bill of particulars in response to Howard's request for the names of the persons as to whom he occupied a position of organizer, supervisor or manager. However, the language of that response is at issue.

> "[T]he government states that those persons *include* the co-defendants and the individuals named in paragraphs 4, 5, 6 and 7 of Count One of the indictment. (Emphasis added)

Howard's counsel complains that he could not adequately prepare a defense where the government was free to introduce evidence as to persons other than the 27 encompassed in the response—the implication of the language "those persons *include* [the 27 named persons]."

Although we agree that the government's language was ill-advised, and we disapprove its refusal to change that language, we note that no proof was submitted at trial as to any persons other than those specified in the bill of particulars. Therefore, no prejudice resulted which would warrant our reversing Howard's conviction, and we hold that the indictment as amplified by the bill of particulars afforded Howard an opportunity fairly and adequately to prepare his defense.

█ *Second.* In 1977 Howard was convicted in the York County Court of Common Pleas, York, Pennsylvania, of one count of heroin distribution. State trooper Lucinda Hammond, whose undercover activities led to the successful state prosecution, also testified at the conspiracy trial. Since evidence from the state trial was introduced to show that the crime committed in Pennsylvania was one of a continuing series of violations required for conviction under 21 U.S.C. § 848, Howard argues that the government was obligated to follow its "*Petite* policy,"[2] the dual prosecution guidelines formulated by the Department of Justice.

This argument is without merit. We agree with the trial judge that the federal charges—large scale conspiracy over an extended period of time—are totally different in nature and degree from the charge for which Howard was tried in Pennsylvania, and that the federal charges included different acts. Thus the *Petite* question did not come into play. And in any event, the *Petite* policy has consistently been held to be a mere housekeeping provision; "the

2. The United States, through the Department of Justice, has promulgated what is known as the "dual prosecution" or "*Petite*" policy. The policy provides that no federal case should be tried when there has already been a state prosecution for substantially the same act or acts, unless the United States Attorney first submits a positive recommendation to the appropriate Assistant Attorney General and such recommendation is approved by the Assistant Attorney General in charge of the division, after the recommendation has been brought to the attention of the Attorney General himself. *See Petite v. United States,* 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960).

general rule is that a defendant has no right to have an otherwise valid conviction vacated because government attorneys fail to comply with departmental policy on dual prosecutions." *United States v. Musgrove,* 581 F.2d 406, at 407 (4th Cir. 1978), and cases cited therein. *Compare United States v. Heffner,* 420 F.2d 809 (4th Cir. 1970) (government compliance with regulation having force of law).

*Third.* Howard argues that his conviction should be reversed because his trial did not begin until 95 days after he was incarcerated as a pre-trial detainee, in violation of the Speedy Trial Act, 18 U.S.C. § 3161 et seq.[3]

Howard was incarcerated on August 11, 1977, immediately after his arrest. On the following day he was hospitalized for treatment of heart irregularities and remained hospitalized until August 22. Trial did not begin until November 14.

Trial was originally scheduled to begin on October 19; however, counsel for a co-defendant (who eventually pleaded guilty) requested a continuance until the first week in November to accommodate his schedule. Howard's counsel then informed the court by letter that, in light of co-counsel's inability to go to trial as scheduled and further in light of his own schedule, trial on or after November 10 would be satisfactory to him.

After trial had been set for November 14, Howard's counsel moved for dismissal or in the alternative for Howard's release from custody. The trial court denied the motion, *United States v. Howard,* 440 F.Supp. 1106 (D.Md.1977), holding that the defendant and his counsel were partially at fault for the delay and thus the interim provisions of the Speedy Trial Act, 18 U.S.C. § 3164, were not violated. Alternatively, the court held that Howard's ten-day period of hospitalization, which would be excludable from the time computation under the permanent provisions of the Act, were also excludable under the interim provisions of the Act.[4]

We find it unnecessary to determine whether the excludable time periods of 18 U.S.C. § 3161(h) are applicable to the interim provisions of 18 U.S.C. § 3164, although we note that there is a split of authority on this issue. *Compare United States v. Corley,* 179 U.S.App.D.C. 88, 548 F.2d 1043 (1976) (time periods applicable) *with United States v. Tirasso,* 532 F.2d 1298 (9th Cir. 1976); *United States v. Krohn,* 560 F.2d 293, 295 and n. 2 (7th Cir. 1977) (time periods not applicable).

First, we agree with the district court that Howard's counsel was partially at fault for the trial delay; although the initial delay until the first week of November was

3. The permanent provisions of the Speedy Trial Act set out certain time limits within which criminal indictments or informations must be filed and arraignments and trials must be held. 18 U.S.C. § 3161. These time limits are phased in gradually until fully operative on July 1, 1979. 18 U.S.C. § 3163. Certain time periods including, *inter alia,* time during which the accused was hospitalized, are excluded from the computation. 18 U.S.C. § 3161(h)(4). The sanction for noncompliance with the time limits is dismissal of the indictment. 18 U.S.C. § 3163.

The Act also provides certain "interim limits" for designated high-risk defendants and for pretrial detainees. 18 U.S.C. § 3164(a). Such persons must be brought to trial "no later than ninety days following the beginning of such continuous detention." 18 U.S.C. § 3164(b). The only time periods expressly made excludable from the 90-day computation are those caused by fault of the accused or his counsel. The sanction for non-compliance is "review by the court of the conditions of release." 18 U.S.C. § 3164(c).

Rule 30,10.(a), Rules of the United States District Court for the District of Maryland, provides:

"A defendant in custody whose trial has not commenced within the time limit set forth in 18 U.S.C. § 3164(b) shall, if the failure to commence trial was through no fault of the defendant or his counsel, be released subject to such conditions as the Court may impose in accordance within 18 U.S.C. § 3146 . . ."

It is undisputed that the interim provisions of the Speedy Trial Act, 18 U.S.C. § 3164, were applicable in Howard's case.

4. With respect to one of Howard's co-defendants who was detained and also sought release, the court also held the Speedy Trial Act unconstitutional as a legislative encroachment upon the judicial function. This co-defendant is not a party to this appeal, and therefore the constitutional issue is not properly before us.

beyond his control, *cf. United States v. Becker,* 585 F.2d 703, at 708 (4th Cir. 1978), he then requested, as an accommodation to his own schedule, that the trial be set on or after November 10. Simple mathematics shows that this requested date was 91 days after Howard's incarceration—a violation of the Speedy Trial Act.

In any event, the sanction for non-compliance with the interim limits is release, not dismissal of the indictment.[5] Counsel cannot point to any prejudice occasioned by the court's failure to release Howard, other than a vague allegation that Howard at liberty may have been able to persuade a certain witness, who had been subpoenaed by the prosecution but was not called at trial, to testify on his behalf. However, at trial counsel informed the court that his client did not wish to request the issuance of a bench warrant to compel her presence; he did not make a proffer of the content of her expected testimony; and he did not move for a continuance to secure her appearance. In short, the allegation of prejudice from the court's failure to release Howard has no support in the record and is certainly no ground for reversal of a valid conviction.

*Fourth.* At trial co-defendant Carla Palmer elected to testify. On direct examination she stated that during plea-bargain negotiations with the government she had made no statements of any kind.

> A: I didn't say anything; I just closed my eyes and shook my head, and didn't reply at all.

On cross-examination the prosecutor attempted to impeach this testimony.

> Q. Didn't you tell Agent McCormack on August 12, when you were in his custody, that you weren't going to go to jail for James Howard, and that you were going to plead guilty and co-operate, but you wanted to talk it over with your family first?
>
> A. I most certainly did not.
>
> Q. You never said that?
>
> A. No, never. I never said anything. I had a right to remain silent, and that is what I did.

The trial court ruled that these questions were improper and instructed the jury to disregard them.

Howard contends on appeal that the questions were a violation of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). This argument is without merit; *Bruton* has been limited to situations where the co-defendant/declarant elects not to testify. *Nelson v. O'Neil,* 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971).

> [W]here a codefendant takes the stand in his own defense, denies making an alleged out-of-court statement implicating the defendant, and proceeds to testify favorably to the defendant concerning the underlying facts, the defendant has been denied no rights protected by the Sixth and Fourteenth Amendments.

*Id.* at 629–30, 91 S.Ct. at 1727. *See also Joyner v. United States,* 547 F.2d 1199 (4th Cir. 1977). Therefore, since the trial court instructed the jury to disregard the line of questioning and did not allow the prosecutor to call Agent McCormack to the stand as a rebuttal witness, Howard received a ruling more favorable than that to which he was entitled.

*Fifth.* Appellant Palmer contests the trial court's failure to give the following instruction to the jury:

> [Heroin-addicted witnesses are] of questionable reliability because of [their] fear . . . of being deprived of . . . the substance [they] crave . . . [therefore their testimony should be] considered with caution.

Palmer argued that this instruction was appropriate because all of the witnesses who testified against him were users of heroin. The court rejected the proposed instruction and instead charged the jury:

> [Consider] any matter in evidence which tends to indicate whether the witness is worthy of belief.

5. We note that Howard's counsel made no further attempt to secure the release of his client, by petition for writ of mandamus to this court or otherwise.

A review of the record indicates that no foundation was laid for the requested instruction, since there was no evidence that any of the witnesses were still addicted to narcotics at the time of trial. In fact, each testified that he was not so addicted. Therefore, we find that the instruction given was sufficient.

*Sixth.* Much of the testimony against both Howard and Palmer was given by co-defendants who had pleaded guilty to charges arising from the indictment. The trial court gave the following instruction to the jury:

> I would further say that the disposition of criminal charges by some agreement between the prosecution and the accused, sometimes loosely referred to as a plea agreement, or a plea bargain has been described by the Supreme Court of the United States as an essential component of the administration of justice, and when properly administered is to be encouraged; the disposition of charges after plea discussions is not only an essential part of the criminal process, but a highly desirable one, primarily because it leads to prompt and largely final disposition of most criminal cases, and for the reasons which for present purposes, I need not elaborate upon.

Appellants argue that the effect of this instruction was to put the imprimatur of the Supreme Court upon testimony given by those witnesses who had pleaded guilty and testified against them. We disagree.

First, the instruction was proper in light of the defense emphasis upon the "deals" struck between the witnesses and the government. *See United States v. Scallion,* 533 F.2d 903, 919 (5th Cir. 1976). Second, the trial court gave a further cautionary instruction:

> You should consider whether the particular accomplice is testifying truthfully or falsely in order to obtain a favorable recommendation by the government in the sentencing in his or her own case.

Viewing the instructions as a whole, we see no danger that an imprimatur was put upon the testimony of witnesses who had pleaded guilty.

*Seventh.* Appellants' final argument that the evidence presented was insufficient to support the convictions is conclusively refuted by a review of the record. Therefore, the verdicts of guilty are

*AFFIRMED.*

WIDENER, Circuit Judge, concurring:

I concur in the result and in all of the opinion of the court other than part *Sixth.*

While an instruction was not improper which said that the law did not discourage plea bargaining, giving it the imprint of authority of the Supreme Court, I think, should be discouraged. We should make it clear that in the usual case such an instruction will be considered error warranting serious consideration, rather than giving our approval to a practice which I consider to be too dangerous to be allowed to continue.

Many commonly used instructions to juries have their roots in Supreme Court opinions, with frequent quotations of language, and now either the government or the defendant (or even plaintiff and defendant in a civil case) may call upon the Supreme Court for its public blessing in open court by way of a charge given to a jury by the trial judge. In a more localized context, it is also now possible, I suppose, to demand instructions quoting by name the various appellate courts or even the author of an opinion.

The first Chief Justice, for example, is so widely revered that I should think his name added to a jury instruction might be a significant advantage unless the other side could come up with an instruction in its theory of the case from an equally august presence. By the same token, and of even greater practical application, if one side, in its theory of the case, may quote the Supreme Court by name, but the other side, in its theory, has to depend on any other appellate court for its authority, even though the other appellate decision may be binding precedent, there is little doubt that any advantage would be to the side which ap-

parently had the imprimatur of the Supreme Court behind its position.

My point is that it is *the law* which trial judges give to juries, and it should not make any difference from what source it comes. When giving the source of the law may be an advantage to one side or the other, it should be avoided.

I grant that in most cases a trial judge giving the law to the jury as coming from a statute or regulation, etc., is quite innocuous, and I know of no instance in which the same has been objected to. But I think giving the name of a court or, what would follow, the name of a judge, in an instruction to a jury is a thoroughly dangerous practice and should be disapproved rather than avowed. The possibilities for mischief under the rule we announce today are limitless. On the facts of this case, however, I do feel its use was harmless rather than reversible error.