UNITED STATES of America, Plaintiff,

v.

Oliver WILSON, aka Charles Oliver Wilson, aka Charles Hilton Wilson, C. Wilson Medical Association Laboratory, Inc., Willie Edward Small, Barbara Martin, Illecia Bell, Edward Urbanski, James Byce, Anthony McCarty, John Malachowski, Raymond Zakaria and Richard Zakaria, Defendants.

Civ. A. No. 8–80487.

United States District Court, E. D. Michigan, S. D.

Jan. 3, 1980.

Harold Gurewitz, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

S. Allen Early, Jr., Detroit, Mich., for defendant Wilson.

Charles S. Brown, Detroit, Mich., for defendant Wilson Lab.

Daniel R. Siefer, Detroit, Mich., for defendant Small.

Leo A. Farhat, Lansing, Mich., for defendants Urbanski and McCarty.

George G. Newman, Detroit, Mich., for defendant Malachowski.

Seymour Berger, Detroit, Mich., for defendant Raymond Zakaria.

Sanford Rosenthal, Southfield, Mich., for defendant Richard Zakaria.

## MEMORANDUM OPINION REGARDING DEFENDANTS JULY 26, 1979 MOTIONS IN LIMINE

JULIAN ABELE COOK, Jr., District Judge.

This case originally involved twelve (12) Defendants and fifty-six (56) Counts. Be-

fore trial, Counts 28–56 were severed, and three (3) Defendants either pled guilty or were granted immunity. After the Government's case was completed, six (6) of the remaining Counts were dismissed and one (1) of the Defendants was acquitted. Basically, the twenty-seven (27) Counts originally brought for trial arose out of an alleged conspiracy to defraud Medicaid, to commit mail fraud, and to make false statements.[1]

According to these charges, the unlawful activity was effectuated by various employees of the C. Wilson Medical Association Laboratory who sent fictitious blood specimens to Advance Laboratory. Thereafter, various Advance employees allegedly fabricated laboratory test results from these specimens (or non-existent specimens), for which Medicaid was eventually billed. This laboratory practice has been consistently characterized as "sink testing." ("Sink testing" is explicitly defined in the Indictment). Additionally, the Indictment charges that Advance employees performed, and reported, tests which were not required by treating physicians. It was also alleged that Advance paid Wilson, and the Wilson Laboratory, for certain referrals made by Wilson to Advance to further this illicit result.

The Government has brought to the attention of the Court its intention to recall Raymond Ratliff as a rebuttal witness. In proceedings which were conducted on July 26, 1979, the Government indicated the nature of the rebuttal testimony that it would attempt to elicit from the witness. The Government seeks to inquire into a conversation that Ratliff had with the Defendant, Edward Urbanski, when the latter visited the Damon Corporation headquarters in Boston. Because the prospective testimony of Ratliff is problematic, the Court has decided to address the propriety of its presentation to this jury through a Memorandum Opinion. Although no formal Motion in Limine was made by any of the Defendants, I shall treat their objections as such.

Reference to the Ratliff-Urbanski conversation in question leads the Court back to an earlier controversy between the parties regarding these matters. On June 29, 1979, and before Ratliff was presented by the Government as a witness for its case in chief, the Defendant Willie Small, made a Motion in Limine in anticipation of this very conversation. More specifically, the Motion was directed at Ratliff's testimony which had been presented before the Grand Jury on February 8, 1978 regarding the conversation that he had with Urbanski. According to that testimony, when the Damon Corporation learned of sink testing occurring at Advance (its wholly owned subsidiary), it dispatched Ratliff and other Damon officials to pay a surprise visit to Advance. A few days later, Urbanski flew to Boston to discuss the situation at Advance with Ratliff. The Grand Jury testimony further reveals that Urbanski made what Ratliff characterized as "confessions." These alleged "confessions" involved Urbanski's acknowledgement that there were instances of sink testing occurring at Advance.

In short, it was argued that these statements implicated other Defendants who worked at Advance (if not all of the Defendants) and, therefore, would violate their Sixth Amendment Constitutional right to confront their accusers under *Bruton v. United States*.[2] They further contended that the evidence would be inadmissible under the Federal Rules of Evidence (i. e., hearsay) as to all Defendants except Urbanski.

The Government responded that the statement was not hearsay, as defined in Fed.R.Evid. 801(d)(2)(E), because it was a "statement by a co-conspirator of a party

---

1. Count 1 charges conspiracy, 18 U.S.C. § 371, to (1) defraud Medicaid, (2) to commit mail fraud, 18 U.S.C. § 1341, and (3) to make false statements, 18 U.S.C. § 1001. Counts 5–11 charged false statement violations, 18 U.S.C. § 1001 and Counts 16–19, 21–27 charged mail fraud violations, 18 U.S.C. § 1341. As indicated Counts 2, 3, 4, 12, 13, 14, 15, and 20 were dismissed at the close of the Government proofs.

2. 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

during the course of and in the furtherance of the conspiracy." The Defendants took exception with this characterization, focusing the Court's attention on the words of the Rule—"in the furtherance of the conspiracy."

After a short recess, the Motion in Limine was granted. (30 Trial Transcript 3457–62). The Court concluded that, although the statement was clearly made during the course of the conspiracy, it was equally clear that it was not one made in the furtherance of the conspiracy.[3]

■ The Court reiterates its position that the statement of Urbanski was not one made "in furtherance" of the conspiracy, even under the most expansive application of that phrase.[4] Narrative declarations, like the one involved here, have never been considered to be made in furtherance of a conspiracy.[5] Urbanski was merely telling Ratcliff what had occurred—he in no way was attempting to draw Ratliff into the conspiracy or otherwise further it.

3. The Model Code of Evidence 508(b) and the Uniform Rules of Evidence 69(9)(b) abandoned the "in the furtherance" requirement to insure minimum indicia of reliability. Nevertheless, Congress consciously retained it when it promulgated the Federal Rules of Evidence. *See United States v. Lang*, 589 F.2d 92, 99–100 (2nd Cir. 1978); *United States v. Jackson*, 549 F.2d 517, 533–34 & n.17 (8th Cir. 1977); *United States v. Harris*, 546 F.2d 234, 237–38 & nn.4–5 (8th Cir. 1976); 4 Weinstein *United States Rules* ¶ 801(d)(2)(E)[01] at 801–144 to 150 (1977) [hereinafter Weinstein].

4. *See, e. g., United v. Marks*, 585 F.2d 164, 170 (6th Cir. 1978); *United States v. Jackson*, 549 F.2d at 534.

5. *United States v. Eubanks*, 591 F.2d 513, 520 (9th Cir. 1979). *See also United States v. Weinrich*, 586 F.2d 481, 495–96 (5th Cir. 1978).

6. *See United States v. Matlock*, 415 U.S. 164, 172 n.8, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); 4 Weinstein ¶ 801(d)(2)(A)[01] at 801–116 to 117.

7. The Supreme Court has refused to equate the Confrontation Clause to evidentiary rules related to hearsay, albeit both have similar historical roots, *Dutton v. Evans*, 400 U.S. 74, 86 & nn.16–17, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). Additionally, the Court has never reviewed the constitutionality of federal rules regarding statements of co-conspirators. *See Dutton v.*

Although the earlier ruling did preclude admission under the co-conspirator rule, the Court indicated that the statement was admissible as to Urbanski. For purposes of aiding our inquiry here, the Court will attempt to clarify this aspect of its previous ruling.

If the Government had been permitted to present the statement as to Urbanski, it clearly would have been admissible under Fed.R.Evid. 801(d)(2)(A) as a "statement . . . offered against a party and is . . . his own statement, [made] in either his individual or representative capacity." The Rule does not require that the statement be made against interest. The federal rules have eliminated such a requirement because such a statement is no longer considered hearsay by definitional (and common sensical) fiat.[6] If the statements had also been admissible against the other Defendants under the co-conspirator provision of Rule 801(d)(2) (i. e., 801(d)(2)(E)), then any Confrontation Clause problems would have been eschewed.[7]

*Evans*, 400 U.S. at 82, 91 S.Ct. 210. In *Dutton v. Evans*, the Court adopted a case by case approach to ascertaining if application of a given co-conspirator rule violated the Confrontation Clause. *Id. See United States v. Goin*, 593 F.2d 88, 92 (8th Cir. 1979).

The Circuit Courts of Appeals have consistently found no constitutional error when the co-conspirator exception is satisfied. *See, e. g., United States v. Goins*, 593 F.2d 88, 92 (8th Cir. 1979). This has been the result even when the rendering Court has recognized that Confrontation Clause problems and admission of evidence under 801(d)(2)(E) must be analyzed separately. *See, e. g., United States v. Wright*, 588 F.2d 31, 38 (2nd Cir. 1978); *United States v. Eaglin*, 571 F.2d 1069, 1083–84 & nn.18–19 (9th Cir. 1977). Further, the Seventh Circuit has explicitly held that if evidence is admissible under Rule 801(d)(2)(E), the Confrontation Clause is satisfied, *United States v. Papia*, 560 F.2d 827, 836 & n.3 (7th Cir. 1977), and the Fifth Circuit seems to be in accord. *United States v. Johnson*, 575 F.2d 1347, 1362 (5th Cir. 1978). Our own Circuit has recently adopted this position, although there was intimation of such in previous opinions. *United States v. Marks*, 585 F.2d 164, 170 & n.5 (6th Cir. 1978). The statement of Urbanski, however, was not admissible under 801(d)(2)(E), and consequently, serious confrontation problems continued to exist. *See United States v. Eubanks*, 591 F.2d 513, 521 & n.8 (9th Cir. 1979).

*United States v. Eubanks* [8] supports, by illustration, the Court's earlier refusal to admit Urbanski's admission to Ratliff. In *Eubanks*, co-conspirator Gonzales' common law wife, Gloria Baca, testified, as to what Gonzales had told her about the conspiracy. These statements were admitted by the trial court under 801(d)(2)(E). The Court of Appeals reversed, holding that the communications between Gonzales and his common law wife did not further the conspiracy. More importantly, the Court pointed out that other aspects of Baca's testimony which related to actions that had been taken by various co-conspirators, and to statements that she overheard the Defendants make to one another, were inadmissible. Albeit allowable under 801(d)(2)(A) against the individual declarants, they could not be considered as evidence against the other Defendants. The Court cited *Bruton* for this proposition.

■ Here, the same principles apply. Although the Urbanski statement would clearly have been admissible against him as a party admission under 801(d)(2)(A), *Bruton* would have precluded its admission, even with a cautionary instruction, unless it fell within the co-conspirator rule of 801(d)(2)(E). I have already held and reiterated, it did not.

Finally, the Court would note that the earlier ruling was also premised, in part, on Rule 403. I believe 403 considerations are part and parcel, at least *sub rosa*, of the Court's reasoning in *Bruton*. There the Court was cognizant of the inability of jury to follow cautionary instructions.[9] In fact, it cited a law review article (discussing the University of Chicago Jury Project) which reported, in part, that cautionary instructions tend to compound the difficulty that juries experience in disregarding inadmissible evidence.[10]

In *Bruton*, the Appellant's co-defendant, Evans, had made a post-arrest confession to the crime charged, which also implicated the Appellant, Bruton. At trial, Evans did not take the stand. Evans' confession, coming through the mouth of the officer to whom it was made, was admitted. The trial court cautioned the jury that the statement should be considered only as to Evans. In finding the cautionary instruction inadequate to protect Bruton's right to confront his accusers, the Supreme Court certainly considered the fact that the prejudicial impact of the statement vis-a-vis Bruton far outweighed its probative value vis-a-vis Evans. Indeed, the Court raised the prejudicial impact factor to one of Constitutional significance. Utilizing 403 to effectuate justice usually seems like cutting with a very blunt instrument. However, application of its working principle here is integrally related to, and consistent with, Constitutional analysis under the Confrontation Clause.

We now come to the present issue; i. e., whether the Urbanski admissions can come in on rebuttal through Ratliff, even though Urbanski, who took the witness stand, was not afforded the opportunity of admitting or denying the statement during the government's cross-examination. It is claimed that the admissions were proffered for the purpose of impeaching Urbanski, and not for the purpose of establishing substantive evidence in chief. The Government further claims that any difficulty that the jury might have in distinguishing these purposes could be aborted through cautionary instruction.

■ The import of Urbanski's testimony was that he had no knowledge of sink testing occurring just prior to the surprise visit by the Damon officials. He stated that a few days before that visit, a Damon official (Flynn) came to Advance and informed him that Damon believed there was sink testing occurring at Advance. Flynn further stat-

---

**8.** 591 F.2d 513 (9th Cir. 1979).

**9.** *Bruton v. United States*, 391 U.S. at 129–30 & n.4, 88 S.Ct. 1620.

**10.** *Id.* at 130 & n.4, 88 S.Ct. 1620, *citing*, Broeder, *The University of Chicago Jury Project*, 38 Neb.L.Rev. 744, 753–55 (1959). *See also Krulewitch v. United States*, 336 U.S. 440, 455, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring).

ed that Mr. Frank Wodley, an Advance Supervisor in Urbanski's employ, had accused Urbanski of master-minding the sink testing scheme. Urbanski told Flynn he could not believe his good friend, Frank Wodley, would make such accusations. It seems clear that the Defense expected certain inferences would be drawn from this testimony: (1) Urbanski was totally surprised by the accusation; (2) he had no knowledge of sink testing at Advance prior to his discussion with Flynn; and (3) he was in no way involved in any sink testing scam or conspiracy.

Urbanski further testified that, after the Flynn discussion, he asked Wodley to identify those persons who were sink testing so that they might "be fired on the spot." (39 Tr. 4452). He also testified that no Advance employee ever admitted involvement in sink testing to him, but if they had, they would have been "fired on the spot." (39 Tr. 4464). Finally, Urbanski categorically denied having directed Advance employees to process fraudulent specimens from the C. Wilson Laboratory (39 Tr. 4595–98) and also denied all the allegations directed at him contained in the Indictment (39 Tr. 4598). It is clear that the proffered testimony of Ratliff would undermine Urbanski's credibility. As indicated above, the clear import of Urbanski's testimony was that, prior to Flynn's informing him of Wodley's accusations, he had no knowledge of sink testing occurring at Advance. If, through the mouth of Ratliff, the Government can show

that Urbanski indicated that he knew about the occurrence of sink testing prior to his conversation with Flynn, such would work to diminish his credibility by means of a material inconsistent statement.[11]

On cross-examination, the Government did not confront the witness Urbanski with the statement. Under prior case law originating with *Queen Caroline's Case*,[12] it was imperative that before introduction of extrinsic evidence to impeach by means of a prior inconsistent statement, a definite foundation had to be established. That foundation required the witness be asked in advance (i. e., on cross-examination) whether he made the allegedly inconsistent statement.[13] Moreover, the witness had to be confronted with a specific foundational question regarding when, where and to whom the statement was made.[14] The Defendants have objected to the Government utilizing Ratliff to establish the inconsistent statement because Urbanski was never confronted with the statement. Although the Defendants have not cited the *Queen's Case*, clearly their objection is bottomed on it.

■ This objection must fail for various reasons. First, Congress unequivocally abolished the stringent requirements of the *Queen's Case* from the Federal law of evidence when it promulgated Fed.R.Evid. 613(b).[15] Under Fed.R.Evid. 613(b), the witness need only be afforded an "opportunity to explain or deny" a prior inconsistent

---

11. Obviously, this is not an attempt to impeach by means of extrinsic evidence "collateral" to Urbanski's testimony. If believed, the proffered Ratliff testimony would undercut the heart of Urbanski's defense. It should be noted that Weinstein believes the federal rules have abandoned application of any orthodox "collateral" rule. In its stead, he suggests a 403 type of balancing. Application of such a rule could prohibit impeachment via extrinsic evidence that is highly probative (and, therefore, not "collateral") but is also strongly prejudicial. 3 Weinstein, *United States Rules* ¶ 607 06 at 607–71 to 73 & n.49. Even if Weinstein's suggested approach was adopted, its application here would not inhibit impeachment via the Ratliff testimony. The probative impeachment value of such evidence far exceeds whatever prejudice, if any, associated with it.

12. 2 Brod. & Bing., 284, 319, 129 Eng.Rep. 976 (1820) (also referred to as the *Queen's case*).

13. *See* IIIA Wigmore, *Law of Evidence* ¶ 1019, 1025 at 1007–09 & 1020–21 (3d ed. 1940) [hereinafter Wigmore].

14. *See id.* § 1029 at 1029–32.

15. *Hearings before the Subcomm. on Criminal Justice on Proposed Rules of Evidence*, 93d Cong., 1st Sess., ser. 2, at 74–75 (Supp.1973). *See also United States v. Bibbs*, 564 F.2d 1165, 1168–70 (5th Cir. 1977); *United States v. Harvey*, 547 F.2d 720, 722 (2nd Cir. 1976); *United States v. Barrett*, 539 F.2d 244, 256 (1st Cir. 1976); 3 Weinstein, *United States Rules* ¶ 613[02].

statement. Although the Reporter of the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States indicates that the better practice usually would involve laying the traditional foundation, at least by bringing the matter up on cross-examination, such is not mandated by the Rule.[16] As long as the witness has some opportunity to explain or deny at trial, the Rule is satisfied.[17] In fact, it has been explicitly held that it is permissible under the Rule for the Government to call a rebuttal witness for the purpose of impeachment by extrinsic evidence without first recalling the witness to be impeached.[18] This procedure was sanctioned since the defense could request the impeached witness be permitted to testify on surrebuttal or, alternatively, to have its case reopened.[19]

■ Therefore, under Rule 613(b), it is not fatal to the Government's attempt to impeach Urbanski's testimony by recalling Ratliff, that it did not first request to recall Urbanski or attempt to confront him with the alleged statement on cross-examination.

The Government submits an alternative proposition which it asserts, obviates the necessity of having to lay any foundation to impeach by means of extrinsic evidence of inconsistent statements. The last sentence of Rule 613(b) reads, "This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2)." In a case cited by the Government, the Fifth Circuit said, "[T]he last sentence in Rule 613(b) provides that no foundational inquiry is required when the statement is one made by a party-opponent."[20] As discussed earlier, the statement of Urbanski was held to be inadmissible as a co-conspirator statement under 801(d)(2)(E), since it had not been made in the furtherance of the conspiracy.

However, it was clearly a statement that was determined to be admissible as substantive evidence under 801(d)(2)(A) against Urbanski. It was excluded, however, because admission would have necessarily resulted in Confrontation Clause violations as to those Defendants who had been implicated by the statement. If it is the position of the Government that under 613(b) Urbanski need not have been confronted on cross-examination with the statement in order for it to impeach him via Ratliff. I agree. However, if it is the position of the Government that the last sentence of 613(b) should operate to preclude Urbanski, on surrebuttal, from denying or explaining the statement he allegedly made to Ratliff, I reject it for two reasons.

■ First, although the Rule does not operate with respect to 801(d)(2) admissions (here an 801(d)(2)(A) admission), such a preclusion would work contrary to the purpose of the Rule. As Weinstein has observed, "The need for a full explanation is particularly great under the federal rules in those instances where the inconsistent statement may be given substantive effect."[21]

It would appear that 801(d)(2) admissions are specifically excluded from the Rule because they come in as substantive evidence. Consequently, their impeaching effect is incidental, and there is no need to establish any foundation (under the Federal Rules that means permitting an opportunity to deny or to explain) because admissions fall outside the scope and purpose of rules relative to impeachment.[22]

This illustrates a principal defect in the Government's characterization of the proffered Ratliff testimony as evidence that would come in only for purposes of impeachment, and not as evidence in chief.

---

**16.** *See United States v. Barrett,* 539 F.2d at 255–56.

**17.** *See* 3 Weinstein, *United States Rules* ¶ 613[04] at 613–16 & n.6.

**18.** *United States v. Bibbs,* 564 F.2d at 1169–70.

**19.** *Id.*

**20.** *United States v. Cline,* 570 F.2d 731, 735 (8th Cir. 1978).

**21.** 3 Weinstein, *United States Rules* ¶ 613[04] at 613–24.

**22.** 3 Weinstein, *United States Rules* ¶ 613[01] at 613–5 & n.2. *See also United States v. Cline,* 570 F.2d at 735–36.

The entire design of the federal rules is to the contrary.[23]

This Court, therefore, cannot accept the Government's characterization of its proffer as being only for impeachment purposes. If the statement of Urbanski is to come in, it must certainly come in as substantive evidence. The current scheme of our Federal Rules would preclude any other result. Given that it is otherwise admissible, it would be inappropriate to instruct the jury that the statement can only be used for impeachment purposes.

█ The second reason for rejecting a reading of the second sentence of 613(b) as operating to preclude Urbanski, on surrebuttal, from denying or explaining the statement allegedly made by him to Ratliff, is much more basic. When Urbanski took the stand, he was not confronted with the statement either on direct or cross-examination. If Ratliff were allowed to testify as to the statement and Urbanski was precluded from then taking the stand to deny or explain it, the Court is of the belief that it would be denying him, in effect, of the most basic right of a litigant to testify in his own behalf. Whether we perceive that right to be one grounded in the Confrontation Clause (i. e., the right to confront one's accusers necessarily must include the right to take the stand and rebut their testimony) or one grounded in the Due Process Clause, is immaterial.

The Court is under the general admonition of Rule 102 to construe the Rules "to secure fairness in administration." I think this is especially relevant in view of the fact that the Rules provide no procedure for impeachment by prior inconsistent statement. The Court is free to fashion an evidentiary procedure that will "secure fairness in administration" and in so doing is allowed to "expand the Federal Rules of Evidence by analogy to cover new or unanticipated situations." [24]

In summary, the foregoing analysis establishes four significant points. (1) As to Urbanski, the statement which he allegedly made to Ratliff, may be used to impeach his credibility since he "opened the door" by testifying that he had no knowledge of sink testing occurring at Advance prior to his discussion with Flynn. (2) Additionally, this may be done by extrinsic evidence, (i. e., through Ratliff), notwithstanding Urbanski never having been confronted with the statement on cross-examination. (3) Urbanski put his own involvement in any sink testing operation which may have occurred prior to the Flynn conversation squarely into issue.[25] Therefore, the statement, albeit used for impeachment purposes, must come in as substantive evidence under 801(d)(2)(A). (4) Basic fairness would require that Urbanski be given the opportunity, on surrebuttal, to explain or deny the statement.

**23.** Early drafts of Fed.R.Evid. 801(d)(1) would have admitted all prior statements of witnesses as substantive evidence by defining such as non-hearsay. *See* Weinstein, *United States Rules* ¶ 801(d)(1)[01] at 801–68. The Rule was subsequently amended to limit the situations in which prior statements would be given substantive effect. *Id.* at 801–69 to 71. Weinstein and others have criticized this result for very practical reasons. "Prior inconsistent statements should be admitted as substantive evidence in frank recognition of the fact that juries are not likely to distinguish between substantive and impeachment use." 3 Weinstein, *United States Rules* ¶ 613[14] at 613–20 to 21 & n.20.

As to statements made by a party, however, the Congress retained the reasoning of the earlier drafts. Consequently, the approach taken by the drafters of our Rules has put to death any distinction between 801(d)(2) statements being offered for purpose of impeachment or as substantive evidence. At least as to statements of party-opponents, they gave credence to Weinstein's above-noted criticism. Juries certainly would be unable to distinguish between admitting a statement made by a party-opponent for impeachment rather than substantive purposes.

**24.** *See* Statement of Professor Clearly, Reporter for the Advisory Committee, *Hearings on Proposed Rules of Evidence Before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary,* 93d Cong., 1st Sess., ser. 2, at 4 (1973). *See also United States v. Bibbs,* 564 F.2d 1165, 1169 & n.2 (5th Cir. 1977).

**25.** *See United States v. Erb,* 596 F.2d 412, 420 (10th Cir. 1979).

The long and the short of our analysis leads this court to the same conclusion that I reached earlier; namely the statement is admissible as to Urbanski. However, it was excluded earlier because of the ancillary effect that it had upon the Confrontation Clause rights of Urbanski's co-Defendants. The question, having been narrowed, now becomes whether the taking of the stand by Urbanski will justify the admission of his statement into evidence without infringing upon the rights of the other Defendants.

In *Nelson v. O'Neil*,[26] the Supreme Court considered the following issue:

> The question presented by this, then, is whether cross-examination can be full and effective where the declarant is present at the trial, takes the witness stand, testifies fully as to his activities during the period described in his alleged out-of-court statement, but denies that he made the statement and claims that its substance is false.[27]

In *Nelson*, the Declarant was a jointly tried co-Defendant. The Supreme Court answered the above-styled question in the affirmative, holding that the Confrontation Clause rights of the non-testifying Defendant were not violated. The Court said:

> Where a codefendant takes the stand in his own defense, denies making an alleged out-of-court statement implicating the Defendant, and proceeds to testify favorably to the Defendant concerning the underlying facts, the Defendant has been denied no rights protected by the Sixth and Fourteenth Amendments.[28]

In *United States v. Howard*,[29] the Court considered the following problem. One co-Defendant, Carla Palmer, elected to testify. On direct, she testified she had made no statements to the Government during plea bargain negotiations. On cross-examination, the prosecutor attempted to impeach her credibility by asking her whether she had made a statement, during plea negotia-

tions, that she wasn't going to go to jail for the Appellant and was going to cooperate with the Government. She denied making the statement. The trial court directed the jury to disregard the questions, holding them improper. The trial court also prohibited the Government from calling the agent to the stand as a rebuttal witness. On appeal, it was contended that the questions were a violation of *Bruton*. The Fourth Circuit said:

> This argument is without merit; *Bruton* has been limited to situations where the co-defendant/declarant elects not to testify. *Nelson v. O'Neil*, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971). . . . Therefore, since the trial court instructed the jury to disregard the line of questioning and did not allow the prosecution to call Agent McCormack to the stand as a rebuttal witness, Howard received a ruling more favorable than that to which he was entitled.[30]

Although the Fourth Circuit strongly intimated that the trial court should have permitted impeachment by prior inconsistent statement of the co-Defendant through both intrinsic and extrinsic means, perhaps the trial judge applied some sort of "collateral rule."

The Fifth Circuit has recently considered a problem closely analogous to the one presented here in *United States v. Weinrich*.[31] Several Defendants were tried jointly for conspiracy and for importation and distribution of marijuana and hashish. After being apprehended, one of the co-Defendants, Ray, attempted to explain his presence on a boat used for importation to one Agent Gilliland. The trial court did not admit the statement under 801(d)(2)(E), assumedly because it was not made in furtherance of, or in the course of, the conspiracy. However, the trial court did find that as to Ray the statement was admissible

---

26. 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971).

27. *Id.* at 627, 91 S.Ct. at 1726.

28. *Id.* at 629–30, 91 S.Ct. at 1727.

29. 590 F.2d 564 (4th Cir. 1979).

30. *United States v. Howard*, 590 F.2d at 569.

31. 586 F.2d 481 (5th Cir. 1978).

under 801(d)(2)(A). It, therefore, allowed Gilliland to testify as to what Ray had said to him but only after redacting the statement such that references to other Defendants were excised and replaced with the word "someone." More specifically, Gilliland testified that Ray had said he was asked by "someone" to proceed to Clearwater, Florida to make repairs on a boat. Ray then took the stand and attempted to explain the statement made to Gilliland, and, on cross-examination by the Government, Ray was asked, in effect, who that "someone" was. Ray said that one Rissick had said Mr. Blair, co-defendant-appellant, wanted to know if Ray would go out on the boat and check the engine. Blair's counsel did not exercise his right to cross-examine Ray.

Blair alleged a violation of *Bruton* on appeal. The Fifth Circuit responded as follows:

> None of Blair's rights under either *Bruton* or the Federal Rules of Evidence were violated by the procedure followed by the district court. No *Bruton* violation occurred because Blair and all the other Defendants were given the right to confront Ray on cross-examination when Ray actually testified.[32]

As noted, Weinrich deals with a fact-pattern which is very similar to that involved here. There are, however, some interesting and non-trivial distinctions. First, in *Weinrich*, the 801(d)(2)(A) admission was redacted to avoid *Bruton* consequences. Although redaction of the Urbanski statement might have been possible, the Court has grave doubts, given the character of the statement ("sink testing was going on at Advance") about how this would have been accomplished. In any event, the Government did not suggest such a modification at the time the original Motion in Limine was made.

■ *Weinrich* is distinguishable for yet another reason. In that case, when Ray came to the stand, Agent Gilliland had already testified. Consequently, Ray was confronted on both direct and cross-examination with questions relating to the statement he made to Gilliland. Here, although Urbanski took the stand, he was not confronted on direct or cross-examination with the statement he allegedly made to Ratliff. I think the better procedure would have been for the Government to have expressed its intention to confront Urbanski with the statement on cross-examination and then proceed to present Ratliff, on rebuttal, if it felt such was necessary or desirable after Urbanski had testified.

First of all, the Confrontation problems would have been totally removed, with the Defendants having had the opportunity to cross examine Urbanski after he had been questioned about the Ratliff statement.[33] Additionally, if Urbanski had admitted making the statement, there would have been no need for bringing Ratliff back to the stand; in fact, such a recall, under those circumstances, would only serve a prejudicial buttressing function. As things stand now, we are left to speculate whether Urbanski will return to the stand or, if he does elect to return or is called, to what facts he would testify regarding the statement or the facts underlying it.

■ As indicated above, the procedure left to the Court by the Government's presentation of the statement through Ratliff on rebuttal is not imperishable under the Rules as they have been construed; a procedure analogous to that permitted by 613(b) (although that provision is not directly applicable because an 801(d)(2) admission is involved). Such only requires that Urbanski be allowed to return to the stand on surrebuttal and be allowed to explain or deny the statement.

That this procedure is acceptable under the Rules, however, does not mean that the Confrontation Clause rights of Urbanski's co-Defendants might not be violated by it.

---

**32.** *United States v. Weinrich*, 586 F.2d at 495.

**33.** *United States v. Howard*, 590 F.2d at 569; *United States v. Weinrich*, 586 F.2d at 495–96;

*United States v. Olander*, 584 F.2d 876, 886 (9th Cir. 1978).

They have had an opportunity to cross-examine Urbanski, but he has *never* testified about the statement implicating them. Although it might be argued that *Nelson v. O'Neil*,[34] should be read as eliminating any *Bruton* problems,[35] once the co-Defendant-declarant takes the stand, I believe such an argument runs contrary to the logic which is inherent in the Rules and the Confrontation Clause. Rule 611(b) states that the scope of cross-examination is limited to the subject matter of the direct examination and matters affecting credibility. Similarly, the Confrontation Clause, at a minimum, requires effective cross-examination as to an accusatory statement. To justify such a reading by asserting that counsel theoretically could have attempted to impeach Urbanski in a fashion similar to that which the Government now attempts, would contort the already strained reasoning of *Nelson v. O'Neil* beyond cognizable form. Therefore, it seems inescapable to the Court, that unless Urbanski elects to return to the stand, or somehow can be compelled to return to the stand by one of the other parties to the lawsuit, it must conclude the *Bruton* problem is still very much alive.

Nevertheless, *Nelson v. O'Neil* only requires that the right to confrontation is a right to confrontation at trial.

> It was clear in *Bruton* that the "confrontation" guaranteed by the Sixth and Fourteenth Amendments is confrontation at trial—that is, that the absence of the Defendant at the time the codefendant allegedly made the out-court statement is immaterial, so long as the declarant can be cross-examined on the witness stand at trial.[36]

▪ If Urbanski voluntarily took the stand on surrebuttal, then all Confrontation problems would disappear because the other Defendants would be able to confront him on cross-examination as to the statement in question. If, however, he did not elect to

return to explain or deny the statement (and we must assume for our purposes here that he will not), then either the Government or other defense counsel will have to be afforded an opportunity to recall him to insure that the confrontation rights of those Defendants who would be implicated by the statement, are protected.

As stated earlier, the Court has considerable difficulty with the procedure forced upon it by the decision of the Government to wait to pursue this matter on rebuttal rather than on cross-examination. First, I would have to consider whether Urbanski waived his privilege against self-incrimination by virtue of his testimony on direct. This, however, does not seem to me to be a major impediment. Secondly, the Government (or the other Defendants) would have to resort to the very unusual procedure of recalling a Defendant, although it does not seem that such is *per se* impermissible.[37]

Finally, and most importantly, several defense counsel, whose clients would be implicated by the statement, have made the strategic choice to present no evidence in defense. To permit the Government on rebuttal to put in the statement through Ratliff could well work a genuine and substantial inequity regarding those choices. If the statement had been admitted on cross-examination of Urbanski, then those Defendants may well have elected to produce witnesses and other evidence or even have elected to take the stand themselves.

The traditional focus of surrebuttal being very narrow, those Defendants would now be precluded from presenting their respective cases even if they wanted to alter their method of defense. The Court could permit them to reopen their cases but there are two very real problems with that approach. First, in all likelihood, it would protract this already overextended multi-defendant litigation, that has stubbornly continued

---

**34.** 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222.

**35.** *United States v. Howard*, 590 F.2d at 569.

**36.** *Nelson v. O'Neil*, 402 U.S. at 626, 91 S.Ct. at 1726.

**37.** *See Johnson v. United States*, 207 F.2d 314, 321–22 (5th Cir. 1953).

throughout an entire, and very hot summer. This could well work a substantial hardship on witnesses who might have to be recalled. Secondly, their reopening could well cause the jury to draw prejudicial inferences from their belated attempts to defend after admission of the statement. In this respect, the procedure could well result in their being denied the basic right to a fair trial.

The mode and order of presentation of evidence and the manner of interrogating witnesses is a matter which has been entrusted to this Court's sound discretion.[38] Although the submission to the jury of the Urbanski statement through Ratliff on rebuttal certainly would work to a better ascertainment of the truth, believes that the Court, on balance, the other considerations discussed heavily preponderate in favor of rejecting the procedure necessary to a proper and constitutionally valid presentation of that evidence. In fact, utilization of that procedure might well result in an abuse of discretion that is otherwise "virtually immune to attack."[39]

The Court, therefore, grants the Motion in Limine of the Defendants and thereby prohibits the Government from recalling Ratliff to testify as to the Urbanski statement.

---

**38.** *See* Fed.R.Evid. 611(a).

**39.** *See* 3 Weinstein, *United States Rules* ¶ 611[01] at 611–15 to 16.